IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ROBERT DOMICO, | : | |
|     Plaintiff, | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| JOHN O. DOWNEY, et al., | : | No.   06-2474 |
|     Defendants. | : | |

**MEMORANDUM AND ORDER**

**Schiller, J.**                                                                                                    **July 19, 2007**

On June 12, 2006, Plaintiff Robert Domico commenced this action for breach of contract against Defendants John O. Downey, #1 South Street Corporation, and Dominico Centofanti. Plaintiff alleges that Defendants owe him a commission in conjunction with the sale of Downey's Restaurant and Bar ("Downey's Restaurant"). A bench trial was held on July 2, 2007. The Court now enters that following findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a).[1]

**I.      FINDINGS OF FACT**

Plaintiff is a business broker who specializes in the sale of restaurants. (July 2, 2007 Tr. at 4.) He works through his company, Domico Investments. (*Id.*) Plaintiff is not licensed as a real estate broker in the Commonwealth of Pennsylvania; therefore he is not involved with the sale of real estate associated with the restaurants that he lists. (Pl.'s Proposed Findings of Fact and Conclusions of Law [hereinafter Pl.'s Findings] ¶ 1; Defs.' Proposed Findings of Fact and

---

[1] Pursuant to Local Rule of Civil Procedure 53.2, this case was submitted to arbitration and an award was entered on May 24, 2007. Defendants timely requested a trial de novo. As required by Rule 53.2(7)(C), this Court did not allow evidence of the arbitration proceedings at trial nor did it consider the occurrence or results of those proceedings in rendering this opinion.

Conclusions of Law [hereinafter Defs.' Findings] ¶ 3; Tr. at 5.)

On March 10, 2001, Plaintiff entered into a listing agreement with Defendant John O. Downey. (Ex. P-1.) Downey held all of the corporate stock of #1 South Street Corporation, the business that owned and operated Downey's Restaurant, and owned the property on which the restaurant was located. (Tr. at 5; Ex. P-1 & P-6.) Pursuant to the listing agreement, Plaintiff was to endeavor for 180 days to find a purchaser for Downey's Restaurant for $1.35 million or another price acceptable to Downey. (*Id.*) The sale price was for the business only, not the real estate. (*Id.*; Tr. at 5.) In exchange, Plaintiff was entitled to a minium commission of ten percent of the sales price. (*Id.*)

Although Plaintiff procured a number of potential buyers within the 180 day contract term, no sale materialized. (Tr. at 7.) Nonetheless, after the expiration of the original agreement and without executing a written amendment or new agreement, Plaintiff continued to search for prospective buyers through 2002 and 2003. (*Id.*) During that time he introduced Downey to twelve or thirteen new prospective buyers.[2] (Tr. at 19.) On November 23, 2003, Plaintiff wrote a letter to Downey listing six prospective buyers and explaining his understanding that, should he successfully find a buyer who purchases Downey's Restaurant for $1.3 million, he would be entitled to a $130,000 commission. (Ex. P-3.) The letter further clarified that Plaintiff would be entitled to payment only on the sale of Downey's business, not on any real estate transaction which comprised part of the final deal. (*Id.*) Downey never responded to Plaintiff's letter or otherwise indicated that he had a different understanding. (Tr. at 11.)

---

[2] Plaintiff's testimony regarding his interactions with Downey was largely undisputed because Defendant Downey failed to appear for the trial.

In September 2003, Plaintiff found an interested buyer, Defendant Dominico Centofanti. (Tr. at 8.) Plaintiff and Centofanti entered into a "Non-Disclosure and Non-Circumvention Agreement" whereby, *inter alia*, Centofanti agreed that he would not enter into any deal or transaction with any party introduced to him by Plaintiff without Plaintiff's prior permission. (Ex. P-2.) The parties also orally agreed that Centofanti would pay Plaintiff $20,000 if a contract to buy or lease Downey's Restaurant successfully materialized. (Tr. at 13-14.)

By December 2003, Plaintiff had introduced Centofanti to Downey, and the two entered into a lease purchase and management agreement. (Tr. at 8; Ex. P-4.) Plaintiff was aware of the negotiations and even drafted his own version of a lease purchase agreement for Defendants; Plaintiff's draft, however, was never consummated. (Tr. at 12; Ex. P-8.) Pursuant to the actual agreement, Centofanti would lease and manage Downey's Restaurant for five years, with an option to purchase that could be exercised at any time during that period. (Ex. P-4.) If Centofanti exercised the option, he would acquire all of the assets of the corporation for $1.3 million and the real estate for an additional $1.3 million, provided that the purchase of both was simultaneous. (*Id.* ¶ 4.) As part of an addendum to their contract, the parties agreed that, if a sale occurred, Downey would give Centofanti a $20,000 credit at closing for funds Centofanti purportedly already paid to Plaintiff as broker. (Ex. P-5.) Centofanti never paid Plaintiff, nor did he receive the credit. (Tr. at 15, 39.)

On January 25, 2006, Centofanti exercised his option and purchased Downey's Restaurant for $2.6 million. (Tr. at 31; Pl.'s Findings ¶ 20; Defs.' Findings ¶ 11.) Centofanti remains the current owner of Downey's Restaurant. (Tr. at 27.)

## II. CONCLUSIONS OF LAW

### A. Plaintiff and Defendant Downey Had a Valid Contract

Neither party disputes that Plaintiff and Defendant Downey entered into a valid and enforceable written contract in March 2001, whereby Plaintiff would act as Downey's broker and agent in the sale of his business. Pursuant to that agreement, Plaintiff was entitled to 10% of the sales price of the business at the time of settlement. Downey, however, contends that the contractual relationship expired after 180 days pursuant to the terms of the written agreement and that "Plaintiff acted voluntarily to procure a buyer." (Defs.' Findings ¶ 14.) As such, according to Downey, no commission is legally due.

Under Pennsylvania law, which the parties agree governs this diversity action, a broker is not entitled to a commission unless he can show the existence of a contract – express or implied, written or oral – that establishes the basis for the commission. *See Axilbund v. McAllister*, 180 A.2d 244, 249 (Pa. 1962). An implied-in-fact contract exists "where parties assent to the formation of a contract, but instead of being expressed in words, the intention to incur obligation is inferred from the conduct of the parties in light of surrounding circumstances including course of conduct." *Buzzmarketing, LLC v. Upperdeck Co., LLC*, Civ. A. No. 03-4392, 2004 WL 966241, at *4 (E.D. Pa. May 6, 2004); *see also Rissi v. Cappella*, 918 A.2d 131, 140 (Pa. Super. 2007). There is no legal difference between an express and an implied contract once formed; the difference lies merely in the manner of formation. *Healthcare Servs. Group Inc. v. Integrated Health Servs. of Lester, Inc.*, Civ. A. No. 96-331, 1998 WL 231265, at *3 (D. Del. 1998) (applying Pennsylvania law) (citing RESTATEMENT (SECOND) OF CONTRACTS § 4 cmt. a); *see also Crawford's Auto Ctr., Inc. v. Pa. State Police*, 655 A.2d 1064, 1067 (Pa. Commw. 1995).

When parties continue to conduct business past the expiration of their written agreement, the law may recognize the existence of an implied-in-fact contract. *Luden's Inc. v. Local Union No. 6 of Bakery, Confectionary, and Tobacco Workers Int'l of Am.*, 28 F.3d 347, 355-56 (3d Cir. 1994) ("[G]eneral principles of contract law teach us that when a contract lapses, but the parties to the contract continue to act as if they are performing under a contract, the material terms of the prior contract will survive intact" unless the parties intend otherwise.); *see also Atofina Chems., Inc. v. Sierra Chem. Co.*, Civ. A. No. 03-2528, 2004 WL 739953, at *3-*4 (E.D. Pa. Apr. 5, 2004); *Hudson v. Radnor Valley Country Club*, Civ. A. No. 95-4777, 1996 WL 172054, at * 2 (E.D. Pa. Apr. 11, 1996). The terms of such an agreement are defined by the conduct of the parties, their course of dealing, and, in some circumstances, by terms that one would not reasonably expect the parties to abandon. *Hudson*, 1996 WL 172054, at *2; *Rissi*, 918 A.2d at 140 ("Implied contracts . . . arise under circumstances which, according to the ordinary course of dealing and the common understanding of men, show a mutual intention t o contract.") (internal quotations omitted).

Here, it is undeniable that the parties intended to be bound by the terms of their original contract past the date of its expiration. Plaintiff's undisputed testimony establishes that, even past the 180 day term provided in the written agreement, he continued to bring potential purchasers to meet with Downey. In fact, Plaintiff testified that after the written contract expired, he brought Downey twelve or thirteen additional prospective purchasers before introducing Downey to Centofanti. With each purchaser, Plaintiff and the prospective buyer would meet with Downey for hours to discuss the contours and financing of a potential purchase agreement. Moreover, on November 23, 2003, Plaintiff wrote a letter to Downey listing six potential buyers and reaffirming his understanding that he would be owed $130,000 should the business be sold for $1.3 million.

Downey never articulated a different understanding. These facts indicate Downey's manifest intention to be bound by the original terms of his contract with Plaintiff past the date of termination.

Defendants' arguments to the contrary do not disturb this conclusion. Defendants first contend that the oral contract stands in contravention of the statute of frauds. However, Pennsylvania's statute of frauds does not bar a claim for services rendered. *See* 13 PA. CONS. STAT. ANN. § 2201 (2007); *Advent Sys. Ltd. v. Unisys Corp.*, 925 F.2d 670, 675 (3d Cir. 1991) (Pennsylvania's commercial code "applies to transactions in goods."); *Jeanette Paper v. Longview Fibre*, 548 A.2d 319, 325-26 (Pa. Super. 1988) (services of paper broker fall outside the ambit of commercial code). Moreover, a business broker, whose clients incidentally transact in real estate along with the sales and purchases of their businesses, does not fall within the scope of the Pennsylvania Real Estate Licensing and Registration Act ("RELRA"). *See* 63 PA. CONS. STAT. ANN. §§ 455.101 *et seq*. Therefore, the writing requirements established therein are inapposite here. As such, Plaintiff's claim for recovery is not defeated by the statute of frauds or the writing requirements of RELRA.

Defendants next argue that the sale of the real estate was inextricably intertwined with the sale of the business and, accordingly, Plaintiff was unlawfully engaged as a real estate broker and must be stripped of his entitlement to any commission under the RELRA. This argument also fails. Although not yet resolved by the Pennsylvania Supreme Court, other courts have predicted that, under Pennsylvania law, a business broker who facilitates the sale of a business or all of the common stock associated with a business, and who incidentally but simultaneously facilitates the sale of real estate, may receive a commission on the sale of the business. *See Gruber v. Owens-Illinois, Inc.*, 899 F.2d 1366, 1375 (3d Cir. 1990) (business broker entitled to commission on sale of corporation stock,

notwithstanding RELRA, where corporate assets included real estate); *Winthrop & Co. v. Milgrom*, 668 A.2d 557, 560-61 (Pa. Super. 1995) ("[I]f appellant is asserting separate transactions involving the business and the real estate, modern business practices would support recovery by appellant of compensation in whole or part."). Here, the sale of the business was separate and apart from the sale of the real estate, Plaintiff did not attempt to broker the sale of the real estate, and Plaintiff has consistently and forthrightly claimed a right only to a commission on the sale of the business. Therefore, Plaintiff is entitled to his commission even though he is not a licensed broker.

Finally, Defendants argue that the price distribution at the time of sale was far from $1.3 million for the property and $1.3 million for the business. They argue that the business was all but worthless and Centofanti reported such to Pennsylvania's liquor board in 2006. (Ex. P-7.) However, according to Downey's accountant, any financial insecurity that plagued the business was known at the time Downey and Centofanti signed their initial lease purchase agreement, which allocated the respective business and real estate prices at $1.3 million each. (Tr. at 47-48.) Further, the argument that Downey's Restaurant was worthless is belied by Centofanti's own testimony that he retained the name "Downey's Restaurant and Bar" because it was a "Philadelphia landmark." (Tr. at 33.) As such, Defendants are bound by the allocation of value between business and real estate established in their agreement.

Under the March 2001 contract, extended by the parties through their course of conduct, Plaintiff was entitled to "10% of the gross sales price, or 10% of whatever sales price is acceptable by the seller at the time of final settlement." (Ex. P-1.) Plaintiff procured Centofanti, who entered into the lease purchase agreement with Downey and ultimately exercised the option to purchase Downey's Restaurant. Pursuant to the lease purchase agreement, when Centofanti purchased

7

Downey's he paid $2.6 million – $1.3 million for the business purchase of Downey's and $1.3 million for the real estate purchase. Thus, consistent with the March 2001 contract, Defendant Downey owes Plaintiff a commission of 10% of $1.3 million, or $130,000 plus interest.[3]  *See generally Williams v. Nationwide Mut. Ins. Co.*, 750 A.2d 881, 884 (Pa. Super. 2000) (elements of breach of contract claim include: (1) existence of a contract; (2) breach; and (3) resultant damages).

### B.     Plaintiff and Defendant Centofanti Had a Valid Contract

For many reasons similar to those discussed above, Plaintiff and Defendant Centofanti had a valid and enforceable oral contract for the payment of $20,000, which amended the contractual relationship established by those parties under the non-disclosure agreement. A written contract that is not for the sale of goods can be modified by an oral contract. *Somerset Cmty. Hosp. v. Allen V. Mitchell & Assocs.*, 685 A.2d 141, 146 (Pa. Super. 1996). To establish an oral contract for services under Pennsylvania law, a plaintiff must establish with clear and precise evidence that: (1) that both parties manifested an intent to be bound by an agreement; (2) that the terms of the agreement were sufficiently definite; and (3) that each party gave adequate consideration. *Gnames Advantage, LP v. CPC Assoc.*, Civ. A. No. 00-4032, 2002 WL 31750209, *3 (E.D. Pa. Nov. 22, 2002) (internal citations omitted); *see also Somerset Cmty. Hosp.*, 685 A.2d at 146. In other words, there must be an agreement to be bound and an agreement as to the essential terms. *Id.*

According to Plaintiff's testimony, in addition to the non-disclosure agreement, Centofanti

---

[3] Plaintiff argues that Centofanti should be jointly liable for the payment of the $130,000 because he and Downey jointly, and in bad faith, cut Plaintiff out of their transaction and because Centofanti breached the non-disclosure agreement. The Court finds that Centofanti did not act out of bad faith and that the evidence does not support a finding that he could be jointly liable for Downey's liabilities. Further, even if Centofanti was in violation of the non-disclosure agreement, it is not clear that the proper remedy for such violation would be payment of $130,000. As such, Defendant Downey is solely liable to Plaintiff for the $130,000 commission.

agreed to pay Plaintiff $20,000 if Centofanti and Downey successfully entered into a lease purchase agreement. (Tr. 13-14.) Centofanti admits that Plaintiff offered to broker a deal between Downey and himself and to ensure that he was first in line to purchase Downey's Restaurant. Centofanti asserts, however, that no formal agreement materialized from that offer – it was "just in the air." (Tr. at 36.) Yet Centofanti's statement is belied by the addendum to the lease purchase agreement, dated December 2, 2003 and signed by both Centofanti and Downey, which states that "[a]t Closing, you [Downey] will give me [Centofanti] a credit of $20,000 for funds which I paid to the broker, Bob Domico." (Ex. P-5.) The Court concludes that the parties entered into an enforceable promise, whereby Plaintiff would be entitled to $20,000 once Defendants Centofanti and Downey successfully entered into a transaction for the lease or sale of Downey's Restaurant. Accordingly, because such a transaction occurred, Plaintiff is entitled to $20,000 plus interest from Defendant Centofanti.

**III.   CONCLUSION**

For the reasons stated above, judgment is entered for Plaintiff and against Defendants Centofanti and Downey.[4] An appropriate Order follows.

---

[4] Plaintiff has presented no evidence nor advanced any legal theory regarding the liability of #1 South Street Corporation. As such, #1 South Street Corporation is dismissed from this action. Similarly, because the Court has found that both Defendants Centofanti and Downey were in breach of their respective contracts, the Court need not consider Plaintiff's claim for recovery as a third party beneficiary.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ROBERT DOMICO, | : | |
|     Plaintiff, | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| JOHN O. DOWNEY, et al., | : | No.   06-2474 |
|     Defendants. | : | |

## ORDER

**AND NOW**, this **19th** day of **July**, **2007**, upon consideration of Plaintiff's Proposed Findings of Fact and Conclusions of Law, Defendants' Proposed Findings of Fact and Conclusions of Law, following a bench trial on the merits, and for the foregoing reasons, it is hereby **ORDERED** that:

1. Judgment is entered in favor of Plaintiff and against Defendant John O. Downey in the amount of one hundred thirty thousand dollars ($130,000) plus prejudgment interest to be calculated at a simple interest rate of six percent per year from January 25, 2006.[5]

2. Judgment is entered in favor of Plaintiff and against Defendant Dominico Centofanti in the amount of twenty thousand dollars ($20,000) plus prejudgment interest to be calculated at a simple interest rate of six percent per year from December 1, 2003.

---

[5] Under Pennsylvania law, prejudgment interest for a breach of contract claim is awarded as a matter of right and, unless otherwise specified, is calculated as simple interest at a rate of six per cent per year. 41 PA. CONS. STAT. ANN. § 202; *Fernandez v. Levin*, 548 A.2d 1191, 1193 (Pa. 1988).

3. The Clerk of Court is directed to close this case.

BY THE COURT:

_____
**Berle M. Schiller, J.**